UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

_____

IN RE:

ATRIUM MEDICAL CORP. C-QUR MESH             MDL DOCKET NO. 2753
PRODUCTS LIABILITY LITIGATION               1:16-MD-02753-LM

This document relates to:

Dean Knauss    Civil Action No.: 1:18-cv-01187-LM

_____

## **PETITION/MOTION TO SETTLE ATTORNEYS' FEES**

Petitioner BRIAN A. GOLDSTEIN individually and on behalf of GOLDSTEIN
GRECO, P.C., respectfully petitions this Court to settle attorneys' fees in the above
captioned matters and respectfully states the following upon information and belief:

## **HISTORY**

1.      Petitioner BRIAN A. GOLDSTEIN, was and remains the attorney of
record in each of the above captioned matters from inception to the present.

2.      Petitioner GOLDSTEIN GRECO, P.C., is a law firm and
professional corporation  established in July, 2022 organized and existing under
the laws of the State of New York with a principal office located at 2354 Wehrle
Drive, Buffalo, New York 14221.

3.      ROSS M. CELLINO, is an attorney admitted to practice law in the
State of New York, a former principal of CELLINO & BARNES, PC and a
principal of CELLINO LAW, LLP.

4.      CELLINO & BARNES, PC (hereinafter CELLINO & BARNES) was
a law firm and professional corporation that, pursuant to dissolution proceedings
brought by ROSS M. CELLINO, was dissolved on or about October 9, 2021.

5.      BRIAN A. GOLDSTEIN established the Mass Tort department at
CELLINO & BARNES in 2002.  For the next *nineteen* (19) *years* he grew and
managed that department.

6.      BRIAN A. GOLDSTEIN <u>personally paid and contributed</u> a *pro rata* share of the salary of the CELLINO & BARNES' associate attorney in the Mass Tort Department.

7.      BRIAN A. GOLDSTEIN <u>personally paid and contributed</u> a *pro rata* share of staff salaries, supplies, and advertising at CELLINO & BARNES for the Mass Tort Department.

8.      CELLINO & BARNES and CELLINO LAW  extensively capitalized on BRIAN A. GOLDSTEIN's quality of representation, results, credentials, and skills in contribution to their practice overall as well as in advertising for personal injury and Mass Tort cases (Exhibit J).

9.      In addition to web advertising BRIAN A. GOLDSTEIN was the only attorney other than ROSS M. CELLINO and STEPHEN E. BARNES themselves (principals of CELLINO & BARNES) to ever appear in TV commercials at CELLINO & BARNES.

10.     In addition to web advertising BRIAN A. GOLDSTEIN was the only attorney other than ROSS M. CELLINO and STEPHEN E. BARNES themselves (principals of CELLINO & BARNES) to ever appear in firm brochure at CELLINO & BARNES (Exhibit J).

11.     BRIAN A. GOLDSTEIN was the *only* attorney at CELLINO & BARNES and the *only* attorney at CELLINO LAW ever admitted to practice before this Court (MDL. No. 2753).

12.     BRIAN A. GOLDSTEIN was and remains the only attorney of record for these claimants.

13.     Each of the at-issue claimants throughout their Atrium Medical Corp., C-Qur Hernia Mesh Products Liability Litigation was represented solely by BRIAN A. GOLDSTEIN at CELLINO & BARNES and/or at CELLINO LAW and at GOLDSTEIN GRECO, P.C.

14.     Upon the dissolution of CELLINO & BARNES in 2021, BRIAN A. GOLDSTEIN brought his clients with him and established and managed the Mass Tort department at CELLINO LAW,  LLP.

15.     CELLINO LAW, LLP (hereinafter CELLINO LAW)  is a law firm and professional corporation organized and existing under the laws of the State of New York with a principal office located at 800 Delaware Avenue, Buffalo, New York 14209.

16.     BRIAN A. GOLDSTEIN's contract with CELLINO LAW in pertinent part provided that he was to receive a salary plus 10% of net attorneys' fees and 50% of net attorneys' fees for attorney referrals to him (Exhibit K).

17.     The 50% net for attorney referrals was reconfirmed in October, 2020 (Exhibit L).

18.     At-issue claimant Bonnie Shelly was an attorney referral to BRIAN A. GOLDSTEIN (*see* Exhibit H).

19.     ALEXANDER J. GRECO's contract with CELLINO LAW in pertinent part provided that he was to receive a salary plus 1% of net attorneys' fees (Exhibit M).

20.     In  June, 2021 ROSS M. CELLINO advised the attorneys that he would not honor the terms of the CELLINO LAW employment contracts.

21.     On June 24, 2021 BRIAN A. GOLDSTEIN and ROSS M. CELLINO met regarding his contract.  They agreed that to a future salary reduction and to a reduction in percentages on certain new cases.

22.     In January, 2022 ROSS M. CELLINO advised BRIAN A. GOLDSTEIN that CELLINO LAW would no longer honor additional terms of his contract and the CELLINO LAW no longer wanted to have any Mass Tort cases and that BRIAN A. GOLDSTEIN should consider establishing his own law firm and take all his Mass Tort clients with him.

23.     Discussions initiated by ROSS M. CELLINO continued throughout March, 2022, April, 2022, May, 2022 and June 2022 regarding BRIAN A. GOLDSTEIN establishing a law firm for the purposes of taking all CELLINO LAW Mass Tort and Medical Malpractice cases, emphasizing that CELLINO LAW  no longer wished to handle Mass Tort cases, that CELLINO LAW wanted no further responsibility for any Mass Tort cases, and that BRIAN A. GOLDSTEIN should take every single one of his Mass Tort cases (100%) with him.

24.     Ultimately, in July, 2020, GOLDSTEIN GRECO, P.C. was established for that purpose.

25.     In July and August, 2020 ROSS M. CELLINO had CELLINO LAW physically box up all physical files and assist the setting up an electronic server and database to transfer all electronic files to GOLDSTEIN GRECO, P.C. (Exhibit N).

26.     In August, 2022 ROSS M. CELLINO confirmed BRIAN A. GOLDSTEIN was to "take 100% of the Mass Tort files" to GOLDSTEIN GRECO, P.C. (Exhibit O).

27.     In August, 2022 ROSS M. CELLINO confirmed that BRIAN A. GOLDSTEIN  and ALEX GRECO would remain in their offices at CELLINO LAW through the end of September, 2020 for the explicit purpose of physically and digitally transferring all files to GOLDSTEIN GRECO, P.C. with "no obligation of CL to follow up on any of Mass Tort files" (Exhibit O).

28.     Accordingly, BRIAN A. GOLDSTEIN began having his clients execute new retainers with GOLDSTEIN GRECO, P.C. (Exhibit I).

29.     Retainer dates for each claimant are as follows (CELLINO & BARNES, Exhibit G; CELLINO LAW, Exhibit H; GOLDSTEN GRECO, Exhibit I):

| Claimant | Cellino & Barnes, PC | Cellino Law, LLP | Goldstein Greco, PC |
|---|---|---|---|
| Ali, Jalila | 08/04/2019 | 10/27/2020 | 10/03/2022 |
| Carrow, Lori | 03/15/2019 | 11/16/2020 | 10/03/2022 |
| Corey, Debra | 07/10/2019 | 10/28/2020 | 10/03/2022 |
| Crawford, Michael | 02/14/2020 | 12/30/2020 | 10/03/2022 |
| Fitzsimmons, Timothy | 07/13/2018 | 10/30/2020 | 01/12/2023 |
| Foster, Sean | 04/05/2019 | 11/02/2020 | 01/10/2023 |
| Hill, Dorothy | 06/19/2018 | 12/07/2020 | 10/03/2022 |
| Knauss, Dean | 05/16/2017 | 11/10/2020 | 10/14/2022 |
| Kroll, Angeline | 08/12/2019 | 10/26/2020 | 10/03/2022 |
| Shelley, Bonnie | 04/16/2019 | 10/30/2020 | 10/03/2022 |
| Shipley, Diane | 11/16/2018 | 11/17/2020 | 10/03/2022 |
| Walker, Elizabeth | 07/30/2019 | 11/17/2020 | 10/03/2022 |
| Winslow, Cindy | 06/12/2017 | 10/27/2020 | 10/03/2022 |

30.     On October 7, 2022, *six days* after CELLINO LAW had finalized the ftransfer of all files and divested itself of all Mass Tort cases and any and all "legal obligation" for these cases to the fledgling GOLDSTEIN GRECO; ROSS M. CELLINO unilaterally sent "a draft of a separation agreement" which included the following:

- GOLDSTEIN … will not leave any Mass Tort cases for CELLINO LAW LLP … since CELLINO LAW LLP does not have any attorney in our office experienced to handle Mass Tort Cases.

- If any clients refuse to retain GOLDSTEIN GRECO, PC, GOLDSTEIN … shall act as co-counsel to CELLINO LAW LLP in order to officially withdraw…"

- "… CELLINO LAW no longer has any legal obligation to continue representing the [Mass Tort] client"

- that it was in each Mass Tort client's "best interest to continue to be represented by Goldstein"

- "**C-Qur Hernia Mesh** matters…. CELLINO LAW LLP acknowledges that there is still administratve work to be completed…. **Cellino Law shall be entitled to 80% of the gross attorney's fees…."**

(Exhibit D)

**31.**     *After* forcing the clients to leave under threat of withdrawal, **ROSS M. CELLINO unilaterally asserted entitlement to 80% of gross attorney's fees** (Exhibit D).

**32.**     And, among other "conditions," that GOLDSTEIN GRECO would pay for CELLINO LAW's fees to withdraw on cases (Exhibit D).

**33.     New York contingent retainers** (including CELLINO & BARNES, CELLINO LAW, and GOLDSTEIN GRECO) **are  33 1/3%.  Common benefit fees**

**are 10%.**  The referring attorney in the Shelly matter is entitled to **1/3** of the net fee.

34.     Attempts to negotiate proved frutless.

35.     CELLINO LAW subsequently bulk e-mailed a form letter to every counsel name it could find listed on every public Mass Tort MDL website claiming "a lien for attorney's fees" and a demand it "be named as an additional payee on any settlement check that may be issued" (Exhibit F).

36.     As set forth in greater detail below, it is respectfully asserted that CELLINO LAW (and CELLINO LAW as whatever sucessor to CELLINO & BARNES) does not retain a lien for files (a) it refused to pursue; (b) it insisted leave the firm and that (c) CELLINO LAW would have withdrawn on upon a refusal to leave.

37.     As set forth in greater detail below, it is respectfully asserted that even if CELLINO LAW (and CELLINO LAW as whatever sucessor to CELLINO & BARNES) is determined to have "referred" its cases to GOLDSTEIN GRECO it is prohibited from sharing in fees under ABA Model Rule 1.5(e) and New York Professional Responsibility Rule DR 2-107(A) which mandate ongiong joint responsibility.

38.     Alternativley, assuming arguendo, that this Honoralbe Court should determine a lien survives, it is respectfully suggested the following factors are material to the issue of attorney's fees:

- GOLDSTEIN GRECO was established because CELLINO LAW was no longer going to represent Mass Tort clients and was going to withdraw on all Mass Tort clients who refused to leave CELLINO LAW.

- Claimants have continiously been represented by GOLDSTEIN GRECO from October, 2022 following CELLINO LAW'S ultimatum to leave or to have CELLINO LAW withdraw.

- GOLDSTEIN GRECO obtained consent and prepared **filed individual appeals** for claimants **Ali, Carrow, Corey, and Kroll.**

- GOLDSTEIN GRECO obtained consent updated, and prepared and **filed additional supproting submissions** for claimants **Carrow, Crawford, Hill and Shipley.**

- GOLDSTEIN GRECO has **prepared and will attend and produce claimant Ali at the claimant's *upcomming* EIF hearing** with the Special Master next week on July 25, 2023.

- GOLDSTEIN GRECO has **prepared and will attend and produce claimant Kroll at the claimant's *upcomming* EIF hearing** with the Special Master next week on July 25, 2023.

- Claimants *will necessarily continue to be represented for an extended timeframe* throughout their respective EIF claims/appeals, document defeciencies, final completion of lien resolution, estate and bankruptcy issues, and through and including the final distribution of each settlement.

- Claimant Bonnie Shelly was a personal attorney referral to BRIAN A. GOLDSTEIN (Exhibit H).

- GOLDSTEIN GRECO will necessarily continue to regularly update each claimant regarding the overall litigation, their individual case, the settlement process, and lien resolution.

- GOLDSTEIN GRECO will necessarily continue to attended all conferences with the Special Master, the Claims Administrator, and the PSC.

- Claimants' proposed settlement values were not assigned to any claimant until May, 2023, months into their representation at GOLDSTEIN GRECO.

- GOLDSTEIN GRECO obtained each claimant's settlement value, reviewed each claimant's medical documentation, and **assessed each claimant's individual proposed settlement** amount in conjunction with the strengths

and weaknesses of each claimant's individual medical history, documentation, and current status.

- GOLDSTEIN GRECO presented each claimant with their individual settlement value.

- GOLDSTEIN GRECO **counseled each claimant** regarding the cliaimant's individual proposed settlement including the options of appeal, EIF claim, acceptance, and rejection.

- GOLDSTEIN GRECO answered all questions of claimant, claimant's family and claimant's representative.

- GOLDSTEIN GRECO **provided individual recommendations** to each claimant and each claimant's representative and family.

- GOLDSTEIN GRECO obtained informed **consent** for the litigation path for each individual claimant.

39.    The process from receipt and evaluation of initial settlement value through final disbursement of funds is *ongoing* and mandates continuing substantial time and effort.

40.    **Contrary to ROSS M. CELLINO's belated offer of "20%" of gross attorneys' fees (on the 33 1/3% retainer from which 10% must be paid in Common Benefit Fees), and frm which referring attorneys must be paid 1/3 of net fees** (Exhibit D)**; GOLDSTEIN GRECO's work is far from "administrative;"** the *ongiong* substantive and substantial work performed by GOLDSTEIN GRECO *only to this date* related above is briefly sumarized as follows:

| CLAIMANT | SHORT FORM COMPLAINT FILED | RELEASE WITHOUT SETTLEMENT AMOUNT RETURNED | SUBSEQUENT/ONGOING WORK AT GOLDSTEIN GRECO, P.C. |
|---|---|---|---|
| Ali, Jalila | 01/10/2020 | 06/13/2022 | Obtained Special Master findings.  Reviewed Special Master findings with client's medical. Obtained initial settlement offer.  Reviewed initial offer including review of claimant's medical records, medical history, and current status.  Assessed settlement offer vs. case value and counseled client regarding overall litigation and case specifics; counselled client regarding overall settlement values and case specific value.  Counseled client and family and provided recommendation/option/ plusses and minuses of instituting an appeal/Extraordinary Injury (EIF) claim vs. accepting settlement vs. continuing litigation. Discussed Special Master findings. **Instituted Appeal/Extraordinary Injury (EIF) Claim.   Preparing and preparing client for EIF hearing; attendance at the** <u>upcoming</u> **EIF hearing scheduled with Special Master for July 25, 2023.** Communication with PSC and Claims Administrator specifically regarding Mr. Ali regarding deficiencies and EIF hearing were on 4/10/2023, 6/15/2023 and 6/22/2023. Verified private healthcare, Medicare and Medicaid information and other potential liens and rights of subrogation. Ongoing assessment of initial settlement documents. Spoke with client/client's representative 10/17/2022, 10/26/2022, 11/16/2022. 11/23/2022. 11/28/2022, 12/19/2022, 12/26/2022, 1/3/2023, 2/9/2023, 2/14/2023, 2/14/2023, 2/20/2023, 3/1/2023, 3/13/2023, 2/24/2023, 3/30/2023, 4/5/2023, 4/18/2023, 4/26/2023, 5/4/2023, 5/15/2023, 5/19/2023, 5/24/2023, 6/15/2023. |
| Carrow, Lori | 01/10/2020 | 03/27/2023 | Completion, follow up, and review of release and related settlement documents.  Obtained Special Master findings.  Reviewed Special Master findings with client's medical.  Obtained initial settlement offer.  Reviewed initial offer |

| | | | |
|---|---|---|---|
| | | | including review of claimant's medical records, medical history, and current status.  Assessed settlement offer vs. case value and counseled client regarding overall litigation and case specifics; counselled client regarding overall settlement values and case specific value.  Counseled client and family and provided recommendation/option/ plusses and minuses of instituting an appeal/Extraordinary Injury (EIF) claim vs. accepting settlement vs. continuing litigation. Discussed Special Master findings.<br>Addressed initial deficiency in settlement packet, cured with client and resubmitted.  Additional Bankruptcy and Estate deficiency raised by defense.  In the process of addressing both the Bankruptcy and Estate deficiencies.  **Instituted Appeal re Special Master findings regarding a second surgery.**<br>Communication with the Special Master, PSC and Claims Administrator specifically regarding Ms. Carrow regarding deficiencies, further submissions, claims rejection, and estate issues were on 3/1/2023, 4/10/2023, 4/24/2023 and 6/7/2023. **Additional submission prepared and submitted to Special Master**.<br>Verified private healthcare, Medicare and Medicaid information and other potential liens and rights of subrogation.<br>Ongoing assessment of initial settlement documents.<br>Spoke with client/client's representative 01/12/2023, 03/01/2023, 3/17/2023, 3/22/2023, 3/27/2023, 5/5/2023, 5/9/2023, 5/10/2023 |
| Corey, Debra | 01/10/2020 | 06/13/2023 | Completion, follow up, and review of release and related settlement documents.  Obtained Special Master findings.  Reviewed Special Master findings with client's medical.  Obtained initial settlement offer.  Reviewed initial offer including review of claimant's medical records, medical history, and current status.  Assessed settlement offer vs. case value and counseled client regarding overall litigation and case specifics; counselled client regarding overall settlement values and case specific value.  Counseled client and family and provided recommendation/option/ plusses and minuses |

| | | | |
|---|---|---|---|
| | | | of instituting an appeal/Extraordinary Injury (EIF) claim vs. accepting settlement vs. continuing litigation. Addressed initial deficiency in settlement packet, cured with client and resubmitted. Additional Bankruptcy and Estate deficiency raised by defense.  In the process of addressing both the Bankruptcy and Estate deficiencies. Discussed Special Master findings. **Instituted Appeal re Special Master determination a second surgery was unrelated to the mesh.** Communication with the Special Master, PSC and Claims Administrator specifically regarding Ms. Cory regarding deficiencies and claim rejection were on 4/10/2023 and 4/24/2023. **Additional submission prepared and submitted to Special Master**. Verified private healthcare, Medicare and Medicaid information and other potential liens and rights of subrogation. Ongoing assessment of initial settlement documents. Spoke with client/client's representative 10/01/2022, 5/10/2023, 6/10/2023. |
| Crawford, Michael | 01/10/2020 | 06/14/2022 | Obtained Special Master findings.  Reviewed Special Master findings with client's medical. Obtained initial settlement offer.  Reviewed initial offer including review of claimant's medical records, medical history, and current status.  Assessed settlement offer vs. case value and counseled client regarding overall litigation and case specifics; counselled client regarding overall settlement values and case specific value.  Counseled client and provided recommendation/option/ plusses and minuses of instituting an appeal/Extraordinary Injury (EIF) claim vs. accepting settlement vs. continuing litigation. Discussed Special Master findings. Communication with PSC and Claims Administrator specifically regarding Mr. Crawford regarding deficiencies and claim rejection were on 4/3/2023 and 4/24/2023. **Additional submission prepared and submitted to Special Master**. |

| | | | |
|---|---|---|---|
| | | | Verified private healthcare, Medicare and Medicaid information and other potential liens and rights of subrogation.<br>Ongoing assessment of initial settlement documents.<br>Spoke with client/client's representative 11/3/2022, 11/9/2022, 1/4/2023, 1/30/2023, 2/7/2023, 2/21/2023, 2/28/2023, 3/28/2023, 4/12/2023, 4/26/2023, 5/3/2023, 5/10/2023, 5/15/2023, 5/18/2023, 5/19/2023, 5/25/2023, 6/15/2023. |
| Fitzsimmons, Timothy | 01/10/2020 | 06/23/2022 | Obtained Special Master findings.  Reviewed Special Master findings with client's medical.  Obtained initial settlement offer.  Reviewed initial offer including review of claimant's medical records, medical history, and current status.  Assessed settlement offer vs. case value and counseled client's family regarding overall litigation and case specifics; counselled client's family regarding overall settlement values and case specific value.  Counseled client's family and provided recommendation/option/ plusses and minuses of instituting an appeal/Extraordinary Injury (EIF) claim vs. accepting settlement vs. continuing litigation.  Discussed Special Master findings.<br>Advised of Estate deficiency raised by defense.  **In the process of addressing the Estate deficiencies.**<br>Communication with PSC specifically regarding Mr. Fitzsimmons regarding deficiencies and estate issues on 06/07/2023.<br>Verified private healthcare, Medicare and Medicaid information and other potential liens and rights of subrogation.<br>Ongoing assessment of initial settlement documents.<br>Spoke with client/client's representative 1/10/2023, 1/12/2023, 5/2/2023, 6/19/2023. |
| Foster, Sean | 01/10/2020 | 02/15/2023 | Completion, follow up, and review of release and related settlement documents.  Obtained Special Master findings.  Reviewed Special Master findings with client's medical.  Obtained initial settlement offer.  Reviewed initial offer including review of claimant's medical records, medical history, and current status.  Assessed settlement offer vs. case value and counseled client regarding overall litigation and case |

| | | | |
|---|---|---|---|
| | | | specifics; counselled client regarding overall settlement values and case specific value. Counseled client and provided recommendation/option/ plusses and minuses of instituting an appeal/Extraordinary Injury (EIF) claim vs. accepting settlement vs. continuing litigation.  Discussed Special Master findings including denial of 12/21/2018 procedure as not attributable to C-Qur mesh. Communication with PSC regarding deficiencies on 02/14/2023 and 03/14/2023. Verified private healthcare, Medicare and Medicaid information and other potential liens and rights of subrogation. Ongoing assessment of initial settlement documents. **Cured deficiency in settlement packet** 2/14/2023 – 2/16/2023). Spoke with client/client's representative 10/28/2022, 11/7/2022, 12/9/2022, 1/9/2023, 1/10/2023, 1/24/2023, 2/14/2023, 2/15/2023, 3/5/2023, 3/15/20234/18/2023, 4/28/2023, 5/24/2023. |
| Hill, Dorothy | 01/10/2020 | | Obtained Special Master findings.  Reviewed Special Master findings with client's medical. Obtained initial settlement offer.  Reviewed initial offer including review of claimant's medical records, medical history, and current status.  Assessed settlement offer vs. case value and counseled client regarding overall litigation and case specifics; counselled client regarding overall settlement values and case specific value.  Counseled client and provided recommendation/option/ plusses and minuses of instituting an appeal/Extraordinary Injury (EIF) claim vs. accepting settlement vs. continuing litigation. Communication with PSC and Claims Administrator specifically regarding Ms. Hill regarding deficiencies and amendment of claim were on 1/11/2023, 1/13/2023, 1/18/2023, 1/23/2023, 1/30/2023, 1/31/2023 and 2/28/2023.  Verified private healthcare, Medicare and Medicaid information and other potential liens and rights of subrogation. Preparation of initial settlement documents. **Updated client's medical history.  Obtained additional medical records.  Successfully** |

| | | | |
|---|---|---|---|
| | | | **amended claim. Prepared new certification page and medical submission to include client's new and additional 10/2022 surgery.** Spoke with client 10/7/2022, 11/22/2022, 1/11/2023, 2/1/2023, 2/27/2023, 4/11/2023, 5/8/2023, 5/10/2023, 6/12/2023, 6/19/2023. |
| Knauss, Dean | 01/10/2020 | | Obtained Special Master findings.  Reviewed Special Master findings with client's medical.  .  Obtained initial settlement offer.  Reviewed initial offer including review of claimant's medical records, medical history, and current status.  Assessed settlement offer vs. case value and counseled client regarding overall litigation and case specifics; counselled client regarding overall settlement values and case specific value.  Counseled client and provided recommendation/option/ plusses and minuses of instituting an appeal/Extraordinary Injury (EIF) claim vs. accepting settlement vs. continuing litigation.  Discussed Special Master findings. Communication with PSC and Claims Administrator specifically regarding Mr. Knauss regarding deficiencies was on 03/23/2023. Verified private healthcare, Medicare and Medicaid information and other potential liens and rights of subrogation. Ongoing assessment of initial settlement documents. Spoke with Client/Client's representative 10/13/2022, 4/20/2023, 4/24/2023, 6/15/2023. |
| Kroll, Angeline | 01/10/2020 | | Obtained Special Master findings.  Reviewed Special Master findings with client's medical.  Obtained initial settlement offer.  Reviewed initial offer including review of claimant's medical records, medical history, and current status.  Assessed settlement offer vs. case value and counseled client regarding overall litigation and case specifics; counselled client regarding overall settlement values and case specific value.  Counseled client and family and provided recommendation/option/ plusses and minuses of instituting an appeal/Extraordinary Injury (EIF) claim vs. accepting settlement vs. continuing litigation. Discussed Special Master findings. **Instituted Appeal/Extraordinary Injury (EIF) Claim.   Preparing and preparing client for EIF** |

| | | | |
|---|---|---|---|
| | | | **hearing; attendance at the <u>upcoming</u> EIF hearing scheduled with Special Master for July 25, 2023.**<br>Communication with PSC and Claims Administrator specifically regarding Ms. Kroll regarding deficiencies, late amendment of claim, claim and EIF claim were on 04/10/2023, 06/15/2023 and 06/22/2023.  Verified private healthcare, Medicare and Medicaid information and other potential liens and rights of subrogation.<br>Ongoing assessment of initial settlement documents.<br>Spoke with client/client's representative 10/7/2022, 10/13/2022, 12/6/2022, 12/20/2022, 4/19/2023, 4/21/2023, 6/7/2023, 6/15/2023. |
| Shelley, Bonnie | 01/10/2020 | | Obtained Special Master findings.  Reviewed Special Master findings with client's medical.  Obtained initial settlement offer.  Reviewed initial offer including review of claimant's medical records, medical history, and current status.  Assessed settlement offer vs. case value and counseled client regarding overall litigation and case specifics; counselled client regarding overall settlement values and case specific value.  Counseled client and provided recommendation/option/ plusses and minuses of instituting an appeal/Extraordinary Injury (EIF) claim vs. accepting settlement vs. continuing litigation.  Discussed Special Master findings.<br>Communication with PSC.<br>**Communication with referring attorney.**<br>Verified private healthcare, Medicare and Medicaid information and other potential liens and rights of subrogation.<br>Ongoing assessment of initial settlement documents.<br>Spoke with Client/Client's representative 10/10/2022, 3/15/2023, 6/20/2023. |
| Shipley, Diane | 01/10/2020 | | Obtained Special Master findings.  Reviewed Special Master findings with client's medical.  Obtained initial settlement offer.  Reviewed initial offer including review of claimant's medical records, medical history, and current status.  Assessed settlement offer vs. case value and counseled client regarding overall litigation |

| | | | |
|---|---|---|---|
| | | | and case specifics; counselled client regarding overall settlement values and case specific value.  Counseled client and provided recommendation/option/ plusses and minuses of instituting an appeal/Extraordinary Injury (EIF) claim vs. accepting settlement vs. continuing litigation.  Discussed Special Master findings.<br>**Updated client's medical history.  Obtained additional medical records.  Prepared new certification page and medical submission to include client's new and additional 2023 surgery.**<br>Communication with PSC and Claims Administrator specifically regarding Ms. Shipley regarding deficiencies, late amendment of claim, and claim were on 01/11/2023, 01/13/2023, 01/18/2023, 01/23/2023, 01/30/2023, 01/31/2023 and 02/06/2023.<br>Verified private healthcare, Medicare and Medicaid information and other potential liens and rights of subrogation.<br>Ongoing assessment of initial settlement documents.<br>Spoke with Client representative 12/6/2022, 12/28/2022, 1/10/2023, 1/11/2023, 1/12/2023, 1/18/2023, 1/20/2023, 1/24/2023, 1/30/2023, 2/2/2023, 2/5/20232/9/2023, 3/7/2023, 4/11/2023, 5/15/2023, 6/7/2023, 6/20/2023. |
| Walker, Elizabeth | 01/10/2020 | | Obtained Special Master findings.  Reviewed Special Master findings with client's medical.  Obtained initial settlement offer.  Reviewed initial offer including review of claimant's medical records, medical history, and current status.  Assessed settlement offer vs. case value and counseled client regarding overall litigation and case specifics; counselled client regarding overall settlement values and case specific value.  Counseled client and provided recommendation/option/ plusses and minuses of instituting an appeal/Extraordinary Injury (EIF) claim vs. accepting settlement vs. continuing litigation.  Discussed Special Master findings.<br>Communication with PSC specifically regarding Ms. Walker regarding deficiencies and claim rejection on 04/10/2023 and 04/24/2023. |

| | | | |
|---|---|---|---|
| | | | Verified private healthcare, Medicare and Medicaid information and other potential liens and rights of subrogation. Ongoing assessment of initial settlement documents. Spoke with Client/Client's representative 10/3/2022, 3/15/2023, 4/20/2023, 6/19/2023. |
| Winslow, Cindy | 01/10/2020 | | Obtained Special Master findings.  Reviewed Special Master findings with client's medical.  Obtained initial settlement offer.  Reviewed initial offer including review of claimant's medical records, medical history, and current status.  Assessed settlement offer vs. case value and counseled client regarding overall litigation and case specifics; counselled client regarding overall settlement values and case specific value.  Counseled client and provided recommendation/option/ plusses and minuses of instituting an appeal/Extraordinary Injury (EIF) claim vs. accepting settlement vs. continuing litigation.  Discussed Special Master findings. Cured release/settlement document deficiency (2/14/2023). Communication with PSC specifically regarding Ms. Winslow regarding deficiencies on 02/14/2023. **Additional submission prepared and submitted to Special Master**. Verified private healthcare, Medicare and Medicaid information and other potential liens and rights of subrogation. Ongoing assessment of initial settlement documents. Spoke with Client/Client's representative 10/4/2022, 2/14/2023, 2/16/2023, 3/22/2023, 5/22/2023. |

41.    As set forth in greater detail herein, it is respectfully suggested that should this Honoralbe Court determine a lien survives, the "20%" unilaterally offered by ROSS M. CELLINO for "administrative work" (Exhibit D) is misguided and fails to consider any of the relevant factors including but not limited to the securement of the cases, the maintanance of the cases, the contributions to the

cases, the settlement of the cases, the ultimate results obtained, and the needs of the claimants which remain ongoing.

CELLINO & BARNES

42.     CELLINO & BARNES was a personal injury firm with no Mass Tort department.  BRIAN A. GOLDSTEIN established, developed, and managed the Mass Tort department from 2002 through 2021.  BRIAN A. GOLDSTEIN personally paid a *pro rata* portion of salaries, advertising and supplies for the Mass Tort department.

43.     On May 10, 2017 ROSS M. CELLINO instituted proceedings against his law firm CELLINO & BARNES and his partner of 20+ years STEPHEN E. BARNES aimed at disolution. The acrimonious litigation spanned years and ultimately resulted in the dissolution of CELLINO & BARNES on or about October 9, 2021 when CELLINO LAW became operational.

44.     Four and one half (4 1/2) years of very public toxic proceedings were extensively reported nationally and regionally which understandably raised severe client concerns, a lack of confidence in the Firm, and questions regarding the viability of the Firm.

45.     Attorneys were repeatedly urged to directly reassure each client that **their individual lawyer was their lawyer** and that their individual lawyer would continue to be **their lawyer** *regardless of what happened to the firm*.

46.     Attorneys were repeatedly required "to contact **your clients** to reassure them that **YOU** will continue to represent them…."(empasis provided); to "call **your clients** to blunt the affect of this negative publicity"; to assuage **your**

**clients'** "concern and consternation" from the "further negative publicity" and to "again contact **your clients** to put them at ease and assure them… that the client's cases will not be affected" (empasis provided). (Exhibit A).

47.    When ROSS M. CELLINO purportedly was "*forced* to file for full receivership" the spectre of bankruptcy became paramount in clients' minds. ROSS M. CELLINO directed the lawyers to "do your best to keep **your clients** happy" (empasis provided). (Exhibit A).

48.    Accordingly, each of BRIAN A. GOLDSTEIN's at-issue claimants was personally contacted and repetedly reassured by  him by letters and by phone calls that <u>he</u> (not any law firm) was their individual lawyer and that <u>he</u> (not any law firm) would remain their individual lawyer.

49.    BRIAN A. GOLDSTEIN's assurances maintained each at-issue claimant as his client.

50.    Neither BRIAN A. GOLDSTEIN nor the at-issue claimants were involved in any of the negotiations that ultimately dissolved CELLINO & BARNES.

51.    Neither BRIAN A. GOLDSTEIN nor the at-issue claimants were made aware of the terms of the confidential settlement agreement. Neither BRIAN A. GOLDSTEIN nor the at-issue claimants agreed to whatever terms were contained in the confidential settlement agreement.

52.    BRIAN A. GOLDSTEIN brought his clients to CELLINO LAW.

CELLINO LAW

53.     Within weeks of opening his new firm  in October 2021, ROSS M. CELLINO began claiming "cash flow" problems following his purchase and renovation of a 48,000 square foot mansion built in 1918 by the Knox family in Buffalo, New York (The Knox Mansion).

54.     ROSS M. CELLINO relentlessly campaigned directly and in thinly veiled writing telling the lawyers to "adjust the low value for your cases" and pressuring lawyers including BRIAN A. GOLDSTEIN to settle as many cases as possible as quickly as possible regardless of value because "we are in need of as many settlements as possible." (Exhibit B)(Exhibit C with permission).

55.     ROSS M. CELLINO further advised that he was unilaterally rescinding and would no longer abide by portions of attorney's contracts, including salaries, including BRIAN A. GOLDSTEIN.

56.     ROSS M. CELLINO terminated lawyers, wholesale terminated staff, restricted disbursements, delayed payment of disbursements, delayed settlement payments to clients, restricted and eliminated supplies, and increasingly directly interfered with the individual lawyer's judgement and ability to properly manage their cases; including BRIAN A. GOLDSTEIN.

57.     ROSS M. CELLINO subsequently advised BRIAN A. GOLDSTEIN that he was not going to abide by yet additional provisions in his contract.

58.     As noted above, ROSS M. CELLINO advised BRIAN A. GOLDSTEIN that he should establish a firm and take 100% of his Mass Tort (and other) clients with him.

59.     As set forth in greater detail herein; **BRIAN A. GOLDSTEIN could not properly continue to represent his clients at CELLINO LAW and BRIAN A. GOLDSTEIN's clients could either leave CELLINO LAW or CELLINO LAW would withdraw from representing them** (Exhibit D).

THE AT-ISSUE MASS TORT CLAIMANTS

60.     At the dissolution of CELLINO & BARNES, BRIAN A. GOLDSTEIN brought his approximately 1,000 clients to CELLINO LAW.

61.     At inception; the Mass Tort department at CELLINO LAW had three (3) lawyers, four (4) legal assistants/paralegals and one (1) secretary.

62.     In the short period between October, 2021 and September, 2022; ROSS M. CELLINO gutted the Mass Tort lawyers and staff to two (2) lawyers (Goldstein and Greco) and (2) legal assistants/paralegals.  ROSS M. CELLINO next advised that one of the two remaining legal assistants would shorlty be reassigned and would not be replaced.

63.     As noted above, beginning in January, 2022 and continuing through August, 2022 ROSS M. CELLINO advised  that

- he would not honor additional portions of BRIAN A. GOLDSTEIN's contract
- he would no longer pay "overhead" to prosecute the Mass Tort cases
- BRIAN A. GOLDSTEIN should take every one of his cases
- **CELLINO LAW would <u>withdraw</u> on any case left by BRIAN A. GOLDSTEIN**
- **CELLINO LAW would have "[no further] obligation to continue representing the client(s)"**

(Exhibit D)

64.    ROSS M. CELLINO insisted that BRIAN A. GOLDSTEIN take every single one of his cases including the at-issue claimants (Exhibit D).

65.    ROSS M. CELLINO told BRIAN A. GOLDSTEIN that CELLINO LAW would no longer handle Mass Tort cases and did not and would not have anyone else who could handle the Mass Tort cases (Exhibit D).

66.    ROSS M. CELLINO told BRIAN A. GOLDSTEIN that it was in each Mass Tort **client's "best interest to <u>continue</u> to be represented by Goldstein**" elsewhere (Exhibit D).

67.    ROSS M. CELLINO had CELLINO LAW personnel box up the Mass Tort physical files, copy the electronic files, and help transport all of the files to GOLDSTEN GRECO.

68.    Goldstein and Alex Greco were the *Eighteenth (18th)* and *Ninteenth (19th)* of 32 lawyers (to date) no longer at CELLINO LAW in the short time since its inception (Exhibit E).

69.    ROSS M. CELLINO unilaterally terminated BRIAN A. GOLDSTEIN's contract effective September 1, 2022 (Exhibit D).

70.    These clients were told to leave. The clients could not stay at CELLINO LAW.  ***CELLINO LAW would no longer represent them*** and ***CELLINO LAW would <u>withdraw</u> from any client that did not leave*** (Exhibit D).

71.    BRIAN A. GOLDSTEIN and Alex Greco did not sneak out with cases. BRIAN A. GOLDSTEIN and Alex Greco did not steal files.

72.     BRIAN A. GOLDSTEIN, attorney for his clients, necessarily continued his clients' cases at GOLDSTEIN GRECO.

73.     Six days after achieving his goal of all files gone from CELLINO LAW; ROSS M. CELLINO sent a "draft of a separation agreement" seeking "80%" of attorneys' fees in these clients' cases (Exhibit D).

74.     CELLINO LAW subsequently bulk e-mailed a form letter to every counsel name it could find listed on the public MDL website claiming "a lien for attorney's fees" and a demand it "be named as an additional payee on any settlement check that may be issued" (Exhibit F).

75.     The instant Petition is necessarily filed.

### ATTORNEYS' FEES

76.     This Court has ancillary jurisdiction to address attorneys' fees arising out of litigation pending before it.  *Cluett, Peabody & Co. v. CPC Acquisition Co.*, 863 F.2d 251, 256 (2nd Cir. 1988).  Attorneys' fees are considered substantive under the *Erie* doctrine and New York law is properly applied here.  *RLS Assocs., LLC v. United Bank of Kuwait, PLC*, 464 F. Supp. 2d 206, 213 (SDNY 2006); *Itar-Tass Russian News Agency v. Russian Kurier, Inc.,* 140 F.3d 442, 228 (2nd Cir. 1998).

77.     Here, CELLINO & BARNES dissolved.  The at-issue claimants (and BRIAN A. GOLDSTEIN) had no knowledge of - and no agreement with  - any of the terms of the dissolution.

78.    Whatever obligations may or may not exist in the confidential dissolution settlement agreement innur to the parties to that agreement themselves.  The at-issue claimants (and BRIAN A. GOLDSTEIN) have no privity with the dissolved CELLINO & BARNES or with The BARNES FIRM which also arose out of the dissolution.

The Discharge

79.    The at-issue claimants were discharged <u>by</u> CELLINO LAW.

80.    Moreover, it is axiomatic that a discharge is <u>for cause</u> when:

- **When the law firm <u>no longer wishes to provide services</u> to the client "given the nature of their respective cases"**

- **When <u>"it is in the best interest of the client… to continue to be represented by Goldstein"</u> elsewhere**

- **When the law firm wants <u>no further "legal obligation to continue to represent the client"</u>**

- **<u>When the law firm will *WITHDRAW* from any client that does not leave</u> (Exhibit D)**

81.    Under New York law, discharge for cause forfeits entitlement to a fee.  *Campagnola v. Mulholland*, 76 NY2d 38 (1990); *Teichner v, A&J Holsteins*, 64 NY2d (1985); *Sprole v. Sprole*, 151 AD3d 1405 (3rd Dept 2015); *Doviak v. Lowes*, 134 AD3d 1324 (3rd Dept. 20915); *Schulz v. Hughes*, 109 AD3d 8995 (2nd Dept. 2013): *Oreendick v. Chiodo*, 272 AD2d 901 (4th Dept. 2000).

82.    New York law recognizes that an attorney discharged *without cause* may recover for pre-discharge efforts: (a) through a retaining lien on files, papers and other materials in her posession; (b) through a charging lien under Judiciary

Law §475; or (c) in *quantum meruit* "even where the attorney discharged without fault was employed under a contingent fee contract" *Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C.* , 370 F.3d 259, 263 (2d Cir. 2004).

CELLINO LAW IS NOT ENTITLED TO A CONTINGENT FEE

83.     Outgoing counsel discharged *without cause* "may elect to take compensation based upon *quantum meruit*… or, in lieu thereof, the outgiong attorney has the right to elect a contingent precentage fee based upn the proportionate share of the work performed on the whole case."*Cheng v. Modansky Leasing Co.*, 73 NY2d 454 (1989) (emphasis provided); *Jones v. Birnie Bus*, 15 AD3d 951 (4th Dept. 2005).

84.     Where a client discharges an attorney *wihtout cause* "… he or she may recover either (1) in *quantum meruit*… or (2) a contingent portionn of the former client;'s ultimate recovery, but only if both of the parties have so agreed." *Universal Acupuncture v Quadrono & Schwartz*, 370 F.3d 259 (2nd Cir. 2004)(emphasis provided).

85.     "A contingent portion of the former client's ultimate recovery [is not available unless] both  parties [the client and the outgoing attorney discharged *without cause*] have so agreed" *Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C.* , 370 F.3d 259, 263 (2d Cir. 2004).

86.     A contingent fee after discharge *without cause* is only available if "the client and [outgoing] attorney… reach a new agreement that, in lieu of a fixed dollar amount for the *quantum meruit* value of services rendered, the discharged attorney shall receive as compensation a contingent percentage of the recovery."  *Nabi v.*

*Sells*, 70 AD3d 2522 (1st Dept. 2009) (emphasis provided). However, a "[contingent percentage] arrangement of payment cannot be compelled by the attorney; it can only be reached with the consent of the client." *Nabi v. Sells*, 70 A.D.3d 252, 253, (1st Dept. 2009) (emphasis provided).

87.     Here the at-issue claimants did not reach a contingent fee agreement with CELLINO LAW and CELLINO LAW has no claim to a contingent fee.

CELLINO LAW IS NOT ENTITLED TO A RETAINING LIEN

88.     An attorney discharged *without cause* may "possess a common-law retainng lien on the client's file in his or her possession..." *D'Ambrosio v. Racanelli*, 129 AD3d 900 (2nd Dept. 2015)(*quoting Sterling, L.P. v. Youngblood Senior Hous. Asssoc*, 115 AD3d (2nd Dept. 2014)(discharged attorney not entitled to contingency fee).

89.     A retaining lien "applies only to papers and property of the client which are in an attorney's possession and is extinguished when that posession terminates other than by court order." *Kaplan v. Reuss*, 113 AD2d 184 (2nd Dept. 1985)(*citing IN re Cooper*, 291 NY 255 (1943).

90.     A retaining lien must be "founded upon physical possession, and an attorney may forfeit its retaining lien by voluntarily giving away any of the items to which it may have attached." *Schneider v. City of New York*, 302 A.D.2d at 186 (1st Dept. 2002); *see also Bretillot v. Burrow*, No. 14CV7633 JGK MHD, 2015 WL 5306224, at *8 (S.D.N.Y. June 30, 2015). Here, Cellino not only voluntarily relinquished the files, but insisted Goldstein take possession of the files and directed Cellino personnel to assist in transferring of all the physical and the

electronic files.   Cellino forfeited any retaining lien. *Cf. Cheng*, 73 N.Y.2d at 459, (outgoing attorney surrendered rights to retaining lien at time that file was turned over to new counsel).

91.    Moreover, an attorney asserting a retaining lein must seek a prompt hearing for a judicial determinition regarding pre-discharge services which CELLINO LAW failed to do.  *Mosiello v. Velenzula*, 84 AD3d 1188 (2nd Dept. 2011).

CELLINO LAW IS NOT ENTITLED TO A CHARGING LIEN

92.    Charging liens "provided for by New York Judiciary Law Section 475 is for the benefit of an 'attorney of record' only"  *Weg & Myers v. Banesto Banking Corp.*, 175 AD2d 65 (1st Dept. 1991).

93.    Judiciary Law §475 'grants a charging lien to an attorney [discharged *without cause*] only when there has been an appearance by that attorney in an action" *Weg & Myers v. Banesto Banking Corp.*, 175 AD2d 65 (1st Dept. 1991).

94.     "[B]efore an attorney can be granted a lien pursuant to Judiciary Law § 475, he or she must have appeared for the client by participating in a legal proceeding…" *Picciolo v. State*, 287 A.D.2d 721,(2nd Dept. 2001)(emphasis provided).

95.     Simply having the name "Cellino" on a pleading does not confer a Judiciary Law lien. *Bretillot*, 2015 WL 5306224 (discharged attorney who did work "amending plaintiff's initial [filed] Complaint, advising on matters of strategy, corresponding regarding various matters, drafting responses to filings by opposing counsel, resolving copyright issues pending before the Copyright Office, and revising the [ultimately unfiled] Amended Complaint" was not entitled to a Section

475 charging lien because he had never appeared on behalf of the party in the litigation).

96.    Although CELLINO LAW may attempt to claim it "appeared;" it is undisputed that *only* BRIAN A. GOLDSTEIN was admitted to appear before this Court.   No one else at CELLINO & BARNES or CELLINO LAW <u>*could have*</u> appeared in the cases; that BRIAN A. GOLDSTEIN was the only attorney who ever appeared in the cases; that BRIAN A. GOLDSTEIN was the only attorney of record for the at-issue claimants from inception to the present day; and that "Cellino" never appeared at any proceeding.

97.    Further CELLINO LAW failed to require compensation from the client be fixed at the time it was discharged.   CELLINO LAW failed to seek agreement from the client as to a contingent percentage at the time of discharge. *Cheng v. Modansky Leasing Co.*, 73 N.Y.2d 454 (1989).

ASSUMING ARGUENDO THAT CELLINO LAW "REFERRED" THE CASES

98.    Given the voluntary transfer of cases from CELLINO LAW to GOLDSTEIN GREC; CELLINO LAW may suggest the arrangement was a "referral."

99.    It is respectfully asserted that even if CELLINO LAW (and CELLINO LAW as whatever sucessor to CELLINO & BARNES) is determined to have "referred" its cases to GOLDSTEIN GRECO; it is prohibited from sharing in fees under ABA Model Rule 1.5(e) and New York Professional Responsibility Rule DR 2-107(A) which mandate ongiong joint responsibility.

100.    Here, it is clear that ROSS M. CELLINO's explicit intention and goal in transferring all Mass Tort cases to GOLDSTEIN GRECO was so CELLINO LAW would have **no further "legal obligation to continue to represent the client"** (Exhibit D).

101.    A firm divesting itself of cases under threat it would withdraw, and insisting it have no further responsibility for the client, may not share in fees.

CELLINO LAW'S ATTORNEYS' FEE CLAM AFTER IT FORCED ALL CLIENTS TO LEAVE OR CELLINO LAW WOULD WITHDRAW

102.    As set forth above, in these circumstances, CELLINO LAW forfeited entitlement to attorneys' fees given the nature of the discharge.

103.    Clients were forced to leave under threat that **CELLINO LAW would withdraw on any client that did not leave**.

104.    CELLINO LAW, of course, forfeits all fees and all costs when withdrawing from clients who would not leave.

105.    Assuming *arguendo* that CELLINO LAW is permitted to try to claim a recovery sounding in *quantum meruit* **for clients who had to leave or CELLINO LAW would withdraw from their case**; New York considers "a number of variables" inlcuding (a) the time each attorney spent working on the case, (b) the nature of the work performed, (c) the relative contributions of counsel, (d) the quality of service, and (e) the effectiveness in ultimately resolving he matter. *Schneider, Kleinick, Weitz, Damashek & Shoot v. City of NY* 302 AD2d 183, 189, 754 NYS 2d 220 (1st Dept. 2002); *Lai Ling Cheng v. Modansky Leasing Co.*, 73 NY 2d 454 (1989).

106.    Again, assuming *arguendo* that CELLINO LAW is permitted to try to claim a recovery sounding in *quantum meruit* **after it told the clients to leave or CELLINO LAW would withdraw**; New York Courts including the New York Appellate Division, Fourth Department emphasize that where an attorney departs a firm, **equity mandates the most significant weight attaches to the efforts that produce the final result for the plaintiff.** *Janes v. 2630 Attica Rd., Inc.,* 93 NYS 3d 626 (2016), *aff'd* 159 AD3d 1427 (4th Dept. 2018); *Lai Ling Cheng, supra.*

107.    Further, New York Courts

"*recognize the efforts of [incoming counsel] at both firms … despite the length of time the file was at the [outgoing] firm*"
*Janes, supra.* (emphasis provided).

108.    The at-issue claimants were and are BRIAN A. GOLDSTEIN's clients.

109.    **BRIAN A. GOLDSTEIN brought his clients to CELLINO LAW**.

110.    When  ROSS M. CELLINO unilaterally changed, then changed again, then terminated BRIAN A. GOLDSTEIN's contract; decided to stop all services to all Mass Tort clients; demanded every single Mass Tort client leave CELLINO LAW or CELLINO LAW  would withdraw; and insisted CELLINO LAW wanted no "legal obligation to continue to represent the client[s]"; BRIAN A. GOLDSTEIN necessarily continued to represent his clients elsewhere.

111.    **CELLINO LAW now tries a grab of "a lien for attorney's fees" for clients it refused to serve, no longer wanted, explicitly asserted no further legal responsibility, and insisted leave the Firm under threat that if they did**

**not leave, <u>CELLINO LAW would withdraw from their case leaving them</u> <u>without representation</u>.**

112.    The work done by BRIAN A. GOLDSTEIN prior to GOLDSTEIN GRECO, P.C. included client intake, the gathering and review of hernia mesh medical records, the completion and filing of the Court approved Short Form Complaint, the completion of the Plaintiff Profile Form, review of proposed settlement program, and maintaining client contact – including advising each client of the proposed settlement program *and of ROSS M. CELLINO's decision to end representing Mass Tort clients.*

113.    As the Court is aware, the C-Qur releases DID NOT INCLUDE ANY SETTLEMENT DOLLAR AMOUNT.  The Releases secured the client a place in the proposed settlement program pending qualification and pending reaching of the required participation threshold.

114.    Subsequent to these clients' represenation at GOLDSTEIN GRECO, conferences were had with the Special Master, Claims Administrator and PSC on 01/17/2023, 05/18/2023, 06/06/2023 and 06/14/2023.

115.    As the Court is also aware, Special Master findings were not issued until 2023 and settlement values were not assigned to any of these cliamants until May, 2023, months into their representation by GOLDSTEIN GRECO.

116.    Special Master findings were obtained and reviewed at GOLDSTEIN GRECO.

117.    Each claimant was advised and counseled regarding the Special Master findings and the initial award.  Whre appropriate the finding were contested,

updated records obtained, and additional submissions were made at GOLDSTEIN GRECO.

118.    Initial values were assigned when at GOLDSTEIN GRECO.

119.    Initial vlaues were reviewed at GOLDSTEIN GRECO.

120.    Each claimant was advised and counseled regarding their initial award.  Where appripriate, appeals/EIF claims were prepared and brought.

121.    At GOLDSTEIN GRECO these claimants were counseled regarding the overall litigation, the strengeths and weaknesses of plaintiffs' claims, the strength and aviaibility of expert opinion, FDA status of the product, the plusses and minuses and relative costs of settlement vs. litigation, liens and lien resolution, and overall liability and damages.

122.    At GOLDSTEIN GRECO these claimants' initial settlement offers were reviewed when available, their individual medical histories, status, and co-morbidities including alternative causation issues were assessed, each claimant was counseled regarding their individual initial settlement offers.  Potential liens were verified.  Recommendation was provided.  All claimants' questions were answered.

123.    Claimants identified as defecient secondary to Estate and Bankruptcy issues (and both) as well as additional defeciencies were and are in the process of being addressed at GOLDSTEIN GRECO.

124.    EIF hearings are scheduled for next week.

125.    Your affiant respectfully suggests that CELLINO LAW's belated claim of "a lien for attorney's fees" and demand "to be on the settlement check" in these circumstances should be rejected.

126.    Alternativley, your affiant respectfully requests this Honorable Court determine the unilateral offer by ROSS M. CELLINO of **"20%" of gross attorneys' fees (on the 33 1/3% retainer from which 10% must be paid in Common Benefit Fees)** is unfair and insufficient given the substantial, substantive, and determinitave work perfomed by GOLDSTEIN GRECO not limited to the reviews, assessments, counseling, updated and new submissions, appeals, EIF claims and hearings performed to achieve the ultimate result for each claimant including this claimant.

127.    Your affiant finally requests such other and further relief as deemed proper.


Dated: July 21, 2023
Buffalo, New York


    /s/ Brian A. Goldstein
       **BRIAN A. GOLDSTEIN**

**<u>CERTIFICATE OF SERVICE</u>**

      I hereby certify that on July 21, 2023 I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send the notification of such filing to all attorneys of record.

                          /s/ Brian A. Goldstein_____